We'll next hear argument, a divided argument, one defendant each argument. So we'll first hear United States v. Velasquez. Mary Pogalis Good morning. May it please the Court, my name is Mary Pogalis. I'm here speaking on behalf of the defendant Velasquez in this case. I received the Court's order. The two issues that you've identified are the two substantive issues in the case. And I would begin by saying that in that prosecution of Mr. Velasquez, the government faced two huge barriers to conviction that they needed to overcome in one way or another. And the judge, by his rulings, made that possible. The first was their case as to Mr. Velasquez and his involvement as a quote-unquote leader and director in MS-13 depended 100% on one of the most disreputable informants I have seen, including in my 17 years as a prosecutor with the Drug Task Force, where we dealt with many informants. This man was at the bottom of the barrel. So they desperately needed corroboration first. And the judge allowed them to do that when the judge allowed that hearsay confession of Mr. Herrera to come in to evidence. Also the government's entire theory was contradicted by the opinions of the cultural defense experts. It was going to be a big problem for them if the jury heard that, because that was such compelling evidence. And if you look at the reports, at the proffers, which are at the excerpts of record 158 to 176, no reasonable person could help but see how difficult it would be to imagine a person raised in that environment, in that culture, in that timeframe, in that rural community beset by so much brutality and violence in the midst of the Civil War could at the age of 12 be dropped down in San Francisco and be able to comprehend and figure all this out. And so the judge excluded all of that. The government didn't have to deal with it. But the jury was deprived of really critical information because of that. That could have led to an acquittal. I'm not talking sufficiency of the evidence. No, counsel, I think our question really was more narrowly focused not on the cultural expert, but on the preclusion of testimony about the ultimate mental state. Right. So I have noted the evidence that was admitted, that the judge allowed, which was very narrow, and the evidence that was excluded. And I can kind of run through that with you just for you to see where the critical problem arose. And to sum it up, before I go into details, what happened was the testimony came in through Dr. White. It was structured in terms of mental disorder and illness, PTSD, and some psychotic break during the time that he supposedly joined MS-13. So what the jury heard was a lot of symptoms, a lot of formal psychiatric diagnosis, but it was completely, not completely, but very insufficiently tethered to the source of the problem, the accuracy of Dr. White's testimony, and the believability of the portrait that she was relying on. None of that could come in without the cultural context, period. PTSD and all of her other diagnoses were certainly significant, but the cultural defense carried the defense beyond that. The cultural imprint that we receive when we're born into a society is extremely powerful and gives us our entire frame of reference for how we will relate to people, how we will work in community, if at all. And I believe that the conclusions that Dr. White was going to give, well, that she did proffer, clearly she couldn't testify nor could Dr. Burns to the ultimate statement that he could not have formed these mental states. But the mental states are, for Rico, are very different. And I believe that she should have been allowed to testify to the fact that he grew up in a culture, in a community, where everything was one-on-one. No churches, no schools to speak of until he was much older. He only had his family, and if you read through the report, you can see what a horrible group that was for him to be in. He related to people one-on-one. The Rico offenses, which are set out, I can give you the citations if you want specifics, but I'm sure you probably know them and they're in my brief. They're very broad. They're way beyond conspiracy. He, the government had to prove he knew the essential purpose of MS, of MS-13, not of his little clique of friends, but of MS-13, that he needed to intend to facilitate MS-13's purposes. He needed to be aware of the essential nature and scope of MS-13, of the large organization. He needed to commit whatever crimes. He was charged with a conspiracy to aid in murder in aid of racketeering. It had to be in aid of the racketeering enterprise. Counts two and three required proof that the appellant had in mind, that he specifically had in mind and had as a substantial purpose, personal purpose, to gain entrance to or to maintain or increase his position in the enterprise. That is so much more than conspiracy. That's so much more than agreement. I don't see that any reasonable person can look at this man's that he was childlike, that he was operating socially at the level of a six or seven year old child. And that the jury did not get to hear. Dr. White, I think, was allowed to testify, I may be misremembering this, but that your client may have been mentally retarded and delusional. There were... She was concerned that that might be the case because some people had opined that because of his outer behavior. That's why she needed the cultural expert to help her understand if this was delusional, what he was saying. I guess my question is that in light of the fact that this possibility of retardation and delusion were in front of the jury, where the prejudice would lie from the point of describing that in more detail? All right, if I understand your question, it was discounted by the expert herself. It was set out as a possibility. And then she said that the culture, after reviewing the cultural expert's report, she determined those were not issues. And the focus really was more on his language facility, on his rudimentary knowledge of Spanish, which, by the way, certainly played a role in his being able to understand anything about what was going on here. There was no evidence that he ever learned the flecha, the history of MS-13. No evidence. All we have is Mr. Vialta. Really, he's it. And that is a pretty shaky ground. The jury heard about six gruesome, brutal murders. Gruesome. They heard all this detail about what MS-13 was about. But they weren't allowed to hear about who this person was, what his history was, how socially, well, he wasn't retarded in his own community, but certainly in a greater advanced society like San Francisco. You know, we are adaptable as a species, but we're not that adaptable. We can't leave that. Before you run out of time, I'd appreciate your discussing the admissibility of Herrera's statement. Yes. Well, I think that's, I'd brief that. To me, it looks extremely straightforward. There was no co-conspirator statement here. It was, these two men had both been involved in that BART shooting. They both admitted to it. They were both arrested with the murder weapon in hand. It wasn't like one of them was giving the other any new information. They both knew already about the whole thing because they had been part of it. So, and they were both in custody. The show was over. They weren't getting out. There was nothing more to do. This was not a co-conspirator statement. It was blatant hearsay. So what, if you didn't have, how would the outcome have been different? Well, the outcome would have been different because she would have been left with uncorroborated Wilson Vialta. Except that, as you said just a minute ago, there were, there was evidence of other murders as well, not just this one. Not that he was involved in. They were the murders of, I mean, they were murders that,   Do we view this issue for plain error? Do we not? Oh, no. I, no. I mean, I really feel like I, I certainly addressed that at length in my brief. This is not plain error. Every claim that the government made about any of these errors being not preserved for appeal is, is simply wrong. And I think on the Herrera thing, it was clear the judge was ruling on this issue. Whether it was articulated immediately before that ruling or not, and it wasn't even known until, until Vialta was on the stand, what the context was, why this was not a co-conspirator statement, became apparent as he testified. And the judge had said, I'll rule on it at the time. I understand there's an objection that it's not a co-conspirator statement. I'll rule on his statements about that murder. It was specific to the bark killing at that time. And he ruled, and he let it in. And he shouldn't have. So I will like to preserve, I think I have about three and a half minutes left for rebuttal. Yes. You may, you may reserve the remainder. Thank you. Good morning, Your Honors. And may it please the Court, Josh Handel for the United States. Unless the Court prefers otherwise, I'll spend the first part of my argument discussing the diminished capacity expert testimony before turning to the co-conspirator statements. It's well settled that decisions respecting the admission or exclusion of trial testimony are committed to the district court's discretion. That substantial deference is heightened when this court reviews a district court's exclusion or limitation of testimony under Rule 403, which you've said will not be disturbed unless it lies beyond the pale of reasonable justification under the circumstances. Here, the district court acted well within its discretion when it limited two aspects of Dr. Gretchen White's expert testimony. Judge Graber asked my friend about what exactly Dr. White had been allowed to testify to. So I think at the outset, it should be noted that Dr. White was given a wide berth to offer extensive and quite favorable testimony on behalf of Mr. Velazquez. In the presence of the jury, she diagnosed Mr. Velazquez with two recognized psychological conditions, major depression with psychotic features and post-traumatic stress disorder. She testified as well to the practical effects of those diagnoses, specifically naming avoidant behavior, hypervigilance, and a dearth of psychological resources and psychological energy. She testified to what she judged to be the root cause of Mr. Velazquez's PTSD, and in so doing, she directly transmitted to the jury hearsay that Mr. Velazquez had provided to her in their interviews about the fact that he had suffered physical abuse at the hands of his father, that he had been raped by two of his brothers, and that he had witnessed torture and gruesome murders during his childhood in Guatemala. Finally, Dr. White testified that she had consulted with a cultural anthropologist, Dr. Alan Burns, about some of the more incredible aspects of Mr. Velazquez's narrative, and that based on her consultation with Dr. Burns, she concluded that Mr. Velazquez was not exhibiting delusional behavior in his recitation of his childhood trauma. So the record reflects that Dr. White was given wide latitude in her testimony. There were only two extremely narrow areas that the court precluded Dr. White from testifying on. First, under Rule 403, Dr. White was not permitted to testify to the purported nature or attributes of Mr. Velazquez's culture, and the district court highlighted four aspects of her expert report that were problematic in that vein. The supposedly secretive nature of Guatemalan Mayan culture, their purported belief in witchcraft, the severe discrimination that the Mayan minority had experienced in Guatemala, and a Guatemalan stereotype that Mayan men are passive or homosexual. Second, under Rule 704B, Dr. White was not permitted to testify that Mr. Velazquez was unable to form the intent to join a conspiracy, or that he was not capable of forming the mental state necessary to knowingly and voluntarily enter into the alleged gang conspiracy. Both of those limitations were correct. With respect to the Rule 403 ruling, the cultural defense has been a little bit of a moving target, so I think it's important to be precise about what exactly Mr. Velazquez proposed and when. In proffering Dr. Burns, the cultural anthropologist, as an expert, Mr. Velazquez said that he would be valuable in two ways. First, his background knowledge about Guatemalan Mayan society would help Dr. White parse out what was potentially factual from what was possibly delusional in Mr. Velazquez's narrative. Second, Dr. Burns would offer a broad overarching assessment of Guatemalan Mayan culture and show that Mr. Velazquez acted in conformity with certain deficits supposedly common to his ethno-cultural group. The district court correctly allowed testimony serving the first purpose. Dr. White was permitted to consult with Dr. Burns, and Mr. Velazquez was not suffering from delusions, and she testified to both that consultation and her conclusion in front of the jury. The district court correctly excluded testimony serving the second purpose. Evidence that the Mayan minority in Guatemala was subject to discrimination and violence in the 1980s is not remotely probative of Mr. Velazquez's comprehension of the nature of MS-13's activities in 2008 and 2009. In Mr. Velazquez's argument that Guatemalan Mayan culture is, and I'm quoting from the defense's submission here, a world of brutality and black magic that rendered Mr. Velazquez primitive, a pre-Christian hunter, sharpened stick in hand, walking barefoot in the rainforest, runs directly afoul of what this court said in United States v. Cabrera, which is that trial testimony cannot invite the jury to put defendants' racial and cultural background into the balance in determining their guilt. So those twin aspects of the district court's ruling are perfectly consistent and correct. Dr. Burns' expertise may have some value in confirming or refuting for Dr. White factual aspects of Mr. Velazquez's narrative, but it has no probative force if it's just presenting a generalized caricature of a particular ethnic group and suggesting that Mr. Velazquez acted in conformity with those stereotypes. The district court was likewise correct in its limitation under Rule 704B. 704B provides that in a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a particular mental state or condition that constitutes an element of the crime charged or of a defense. Here I think it's most instructive to look at exactly what was submitted to the district court in Dr. White's expert report. She said, quote, it is extremely unlikely that Mr. Velazquez would be capable of forming the mental state necessary to knowingly and voluntarily enter into the alleged gang conspiracy. And, quote, Mr. Velazquez would not be, excuse me, Mr. Velazquez would be unable to form the intent to join a conspiracy or participate in an enterprise, criminal or not. Each of those conclusions improperly invaded the exclusive province of the jury and as such was appropriately excluded by the district court. Again, Dr. White was permitted to testify as to her two diagnoses, the medical basis for those diagnoses, the factual history that she believed underlay those diagnoses, and the symptoms and practical effects that accompany those diagnoses, including the psychological deficits that she believed Mr. Velazquez suffered from. The district court then instructed the jury, both during Dr. White's testimony and again at the end of trial, that they could utilize this testimony to determine whether Mr. Velazquez had the requisite state of mind for the charged offenses. The only thing Dr. White was precluded from doing was to draw that last inferential step for the jury, to expressly state that because of her diagnoses, Mr. Velazquez could not have acted with the requisite mental state. That restriction was faithful to the text and purpose of Rule 704B and the district court did not abuse its discretion in that regard. Unless the court has further questions about expert testimony, I'll turn to the co-conspirator statements. So Rule 801 D2E provides that a statement is not hearsay if it meets three conditions. First, that it was made by a party's co-conspirator. Second, that it was made during the temporal extent of the conspiracy. And third, that it was made in furtherance of the conspiracy. On appeal, Mr. Velazquez does not contest the first two of these criteria. He doesn't contest that Mr. Herrera was his co-conspirator and that Mr. Herrera's statements were made during the course of the conspiracy. I understood the argument today, though, to include the idea that it was all over, that there was no longer a conspiracy in existence. So at least today I understood both of the last two elements to be contested. Well, Judge Graber, I don't think that's backed up by the record. So if you look at the third superseding indictment that came down in September of 2009, that alleged that the conspiracy was ongoing all the way through late 2009. Well, I took her point, though, to be about what the evidence was as it came in, not what the indictment said. Sure. Well, if we look at the trial evidence, one thing that we have going on roughly contemporaneously with this where Mr. Velazquez calls Mr. Vialta after Mr. Vialta has been arrested. And we have a transcript of this call because it's a recorded jailhouse telephone call. And Mr. Vialta and Mr. Velazquez are speaking in code about which guns Mr. Vialta and Mr. Herrera had been caught with, whether they were caught with the Uzi, which they call the Susie in their code, or the little one, the little girl, which was the Lorsen murder weapon from the Daly City BART shooting. So I think the evidence suggests that despite the fact that Mr. Vialta and Mr. Herrera had been arrested, this conspiracy is still ongoing. Mr. Velazquez is still playing a very robust role in the conspiracy. And again, we don't understand from their appellate briefing that they've contested that prong of the analysis. So the only issue that we consider to be before this court is whether Mr. Herrera's recounting of the Daly City BART shooting to Mr. Vialta was made in furtherance of the conspiracy. The district court correctly decided that it was, because violent acts against perceived rivals were the currency of this conspiracy. There's ample trial testimony supporting that. And Mr. Herrera's comments to Mr. Vialta served to vouch for Mr. Velazquez's and Mr. Blom's role during the shooting. That the statement was made in furtherance of the conspiracy is a factual finding that was not objected to below, and as such is here on plain error review. Mr. Velazquez's only argument that this determination was plainly or clearly erroneous is his assertion that Mr. Vialta already knew what had happened at the Daly City BART station, and thus that Mr. Herrera's meaningful contributions to any aim of the conspiracy. But that also is contradicted by the record. Mr. Vialta was in a second vehicle, along with Giovanni Hernandez, that was separated from the vehicle Mr. Herrera was driving. Mr. Vialta's vehicle was unable to catch up to Mr. Herrera's vehicle in time to witness the shooting. So Mr. Herrera's later recitation of these acts served to vouch for both Mr. Velazquez and Mr. Blom as trigger men in this shooting. We would argue that the admission of this evidence as in furtherance of the conspiracy fits very neatly in the mainstream of this court's precedence when it comes to internal communications of gang members. In our brief, we point to United States versus Taman, where you said that statements made to keep co-conspirators abreast of an Similarly in United States versus Yarbrough, you held that statements between gang members detailing a history of a gang's past murders are in furtherance of the conspiracy. So the district court certainly did not abuse its discretion in admitting these co-conspirator statements. I also want to just briefly respond to a point that my friend on the other side made about this idea that 100% of the government's case against Mr. Velazquez depended on Mr. testimony. That's simply not the case. If we look at the trial record, Mr. Martinez, Mr. Palma and Mr. Espinal all testify that Mr. Velazquez had been in MS-13 since late 2004 or early 2005. Mr. Espinal additionally testifies that Mr. Velazquez was part of a posse that attempted to assault him in January 2009 for trying to leave the gang. Mr. Espinal implicates Mr. Mr. Velazquez in the Ivan Miranda murder. So there's plenty of other evidence here that Mr. Velazquez was a robust participant and leader in the 20th Street Click of MS-13. To the extent that some of the government's cases did depend on Mr. Vialta's testimony, there's quite a bit of evidence that corroborates the things that Mr. Vialta said. I already mentioned the recorded jail telephone call in which Mr. Velazquez asks Mr. Vialta about certain guns in code when they're discussing the murder weapons from the Daly City BART shooting. That not only confirms Mr. Velazquez's participation in the Daly City BART shooting, but also Mr. Vialta's testimony that Mr. Velazquez was the one who provided him with the weapons that he and Mr. Herrera were later arrested with. We also have, once again, cell site data that places Mr. Velazquez near the scene of the shooting at the time of the shooting and shortly thereafter near where the vehicle used in the shooting was ultimately recovered the following morning by the police. So again, there's ample evidence in the record both that corroborates the reliability of that Mr. Velazquez was a robust participant in and leader of the 20th Street clique of MS-13. Unless the court has further questions, I'll rest on my brief and respectfully request that you affirm the judgment below. Thank you. Thank you, counsel. You have some rebuttal time remaining. Thank you, your honor. First of all, let me make clear, we are not disputing that Mr. Velazquez was taken in by this 20th Street clique. He was. They embraced him. They took him in. Apparently, he was jumped in. The question is, did he know the bigger picture or was this just a group, a family for him to hook himself up to for protection in a culture and a community that he was completely ignorant about? So no, I'm not disputing that he was a participant. He broke a CD over a Norteño's head or really much of the rest of that. But it was Mr. Vialta who said he was the leader. He gave the orders. He put this shooting together. I saw him. As far as the phone call from the jail, that's meaningless because Mr. Vialta had said, testified that he saw Mr. Velazquez with that Uzi before they set out. Now, you have to believe Mr. Vialta, which is problematic. But even if you believe him, then he said he already knew that he had the Uzi in terms of that confession, so-called confession in the jail. It can't be a co-conspirator statement when Vialta already knew everything. If he wasn't a direct eyewitness, it doesn't mean he didn't know everything. Also, as to what came in in counsel's argument that it was adequate to put this defense before the jury, it totally was not. What was excluded and was critical, among other things, and would have been admissible, it was not as to an ultimate fact, was Dr. White's testimony that Mr. Velazquez suffered severe cultural dislocation, a low level of education, ignorance about American culture and societal value that could cause his mental illness. So she was going, she was prevented from going into the cause of his suicide attempts, of his psychotic breaks, of his depression, of his PTSD. She would have testified that he had a very limited grasp of his role in the events. That's not an element of the crime and it's not a mental state. It goes to his capacity to know who he was within the larger MS-13 group. And she said his very limited grasp of his roles in the event is typically symptomatic of the diagnosed illnesses. So clearly it was relevant. Clearly it was important to the jury's full understanding. And she said, as a clinically recognized consequence of his psychological conditions, he would be extremely susceptible to coercion and intimidation. That didn't come in. Dr. Burns would have testified that Mr. Velazquez's familiarity with social structures beyond just a one-on-one dealing with people, his lack of linguistic skill, his lack of conceptual concepts, what I call a frame of reference to know who you are, who you're with, what you're doing, and why you're doing it, was that of a small child. The jury needed to hear these things. And Mr. Velazquez had a right to have them do it. If you look at the legal standards... Counsel, you exceeded your time and I think we well understand from your briefing and your argument what the issues are. Thank you. The case just argued is submitted and we appreciate both arguments. Our final case on this morning's docket is United States v. Franco.
judges: McKeown, Graber, Christen